PENNSYLVANIA STATE BUILDING AND CONSTRUCTION TRADES COUNCIL, AFL–CIO, and Central Pennsylvania Building Trades Council, Petitioners,

v.

PREVAILING WAGE APPEALS BOARD, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 6, 2000.

Decided Jan. 11, 2001.

Irwin W. Aronson, Camp Hill, for petitioners.

Eric N. Athey, Lancaster, for intervenors.

Before KELLEY, Judge, FRIEDMAN, Judge, and MIRARCHI, Senior Judge.

FRIEDMAN, Judge.

The Pennsylvania State Building and Construction Trades Council, AFL–CIO, and the Central Pennsylvania Building Trades Council (collectively, the trades councils) seek review of the April 14, 2000 order of the Pennsylvania Prevailing Wage Appeals Board (Board), which denied a grievance filed by the trades councils on September 13, 1994. We reverse.

In late 1991, Pennsylvania National Mutual Casualty Insurance Company (PNI) began to explore the feasibility of moving its headquarters in the City of Harrisburg (City) and up to 900 employees to a new suburban site. (Findings of Fact, No. 2.) The City's mayor made several proposals to PNI which were intended to make PNI's remaining in the City a viable option. (Findings of Fact, No. 3.) PNI accepted a proposal that included tax increment financing and a central downtown location for PNI's construction of an office tower and parking garage. (Findings of Fact, No. 5.)

As part of the overall development plan, the City and/or the Harrisburg Redevelopment Authority (HRA) were responsible for conveying the PNI project site to PNI as "bare ground." (Finding of Fact, No. 9.) Over the course of several years, the City and/or HRA acquired a number of properties with the help of an Economic Development Partnership Grant (EDP Grant) of $1,500,000.[1] (Findings of Fact, Nos. 10–11.) Although the City intended to use some of the EDP funds to pay for the demolition of existing structures on the project site, the City used all of the EDP funds to pay for land acquisition and administration of the EDP Grant. (Findings of Fact, Nos. 17–18.) After the City acquired the project site and prepared it for construction, the City conveyed the "bare

---

1. The City received the EDP Grant from the Pennsylvania Department of Commerce pursuant to the Housing and Redevelopment Assistance Law, Act of May 20, 1949, P.L. 1633, *as reenacted and amended*, 35 P.S. §§ 1661–1676. (Findings of Fact, No. 11.)

ground" to PNI, and PNI constructed its new headquarters and parking garage. (Findings of Fact, Nos. 24, 57.)

The construction of PNI's office tower and parking garage was financed, in part, by tax increment financing pursuant to the Tax Increment Financing Act (TIF Act).[2] (Findings of Fact, No. 25.) The City, the County of Dauphin and the Harrisburg School District (collectively, the taxing bodies) approved the creation of a tax increment district and agreed to participate therein by adopting resolutions to that effect.[3] (Findings of Fact, Nos. 22, 31–32.)

As part of the PNI project plan, HRA issued tax increment bonds in a gross amount of not less than $10,500,000.[4]

(Findings of Fact, No. 34.) The bonds indicate on their face that they are a limited obligation of HRA and that HRA does not pledge payment of the principal of, or interest on, the bonds.[5] (Findings of Fact, Nos. 34–35.) PNI purchased all of these bonds.[6] (Findings of Fact, No. 36.) The proceeds from the sale of the bonds were held in trust under an indenture and were disbursed by PNC Bank, the trustee, to Pennsylvania National Realty Trust (PNRT), a wholly owned subsidiary of PNI, to pay a portion of the construction costs of the project.[7] (Findings of Fact, No. 34.) The bonds were secured by a mortgage and security agreement between PNRT, as mortgagor, and PNC Bank, as mortgagee, on the office building and ga-

2. Act of July 11, 1990, P.L. 465, *as amended*, 53 P.S. §§ 6930.1–6930.13. We note that, in conjunction with the TIF financing, HRA adopted a commercial and industrial redevelopment program for the area of the City that includes the PNI project. *See* section 11.1 of the Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, added by section 4 of the Act of March 30, 1988, P.L. 304, *as amended*, 35 P.S. § 1711.1. (Findings of Fact, Nos. 26–27.)

3. A municipality creates a tax increment district, and approves a project plan, pursuant to section 5 of the TIF Act, 53 P.S. § 6930.5. The various taxing bodies, by ordinance or resolution, either agree to participate or opt not to participate, in whole or in part, in the tax increment district. Section 5(a)(7) of the TIF Act, 53 P.S. § 6930.5(a)(7). A tax increment district is a "contiguous geographic area within a redevelopment area defined and created by resolution or ordinance of the governing body of the municipality creating the district...." Section 3 of the TIF Act, 53 P.S. § 6930.3.

Upon creation of the tax increment district, the assessor for the municipality determines the tax increment base. Section 6(b) of the TIF Act, 53 P.S. § 6930.6(b). The tax increment base is the total tax base for the district on the date the district is created; it includes the applicable tax base for real property taxes, business use and occupancy taxes, sales taxes, mercantile license taxes, business privilege taxes, net profits taxes and similar taxes for the privilege of engaging in business within the district. Section 3 of the TIF Act, 53 P.S. § 6930.3. The "tax increment" is determined with reference to the tax increment base and

results from the increase in property values, or from the increase in commercial activity, caused by the project. Section 3 of the TIF Act, 53 P.S. § 6930.3.

4. *See* section 9(b) of the TIF Act, 53 P.S. § 6930.9(b). Payment of project costs may be made out of the municipality's general funds *or* out of the proceeds of the sale of tax increment bonds. Section 9(a) of the TIF Act, 53 P.S. § 6930.9(a).

5. A municipality or school district may guarantee the payment of tax increment bonds, and the issuing authority may create a "lien for the benefit of the bondholders upon any public improvements or *public works* financed thereby or the revenues therefrom." Section 9(i) of the TIF Act, 53 P.S. § 6930.9(i) (emphasis added).

6. Tax increment bonds mature over a period not exceeding twenty years from the date of issue. Section 9(d) of the TIF Act, 53 P.S. § 6930.9(d).

7. Under the TIF Act, the tax increment bonds are payable from positive tax increments that have been deposited in the tax increment fund. Sections 9(b)(1) and 9(h) of the TIF Act, 53 P.S. § 6930.9(b)(1) and 9(h). The tax increment fund is a fund into which are paid all tax increments and all revenues from the sale of tax increment finance bonds or notes and from which money is disbursed to pay project costs for the district or to satisfy claims of holders of tax increment bonds or notes. Section 3 of the TIF Act, 53 P.S. § 6930.3.

rage.[8] (Findings of Fact, No. 34.)

PNRT, as owner of the project buildings, was responsible for paying the base real estate tax and the tax increment resulting from property improvements to the taxing bodies.[9] (Findings of Fact, No. 49.) The taxing bodies collected the tax increments paid by PNRT and, in turn, paid them to PNC Bank, to be held in trust under the indenture for payment of debt service to PNI on the tax increment bonds.[10] (Findings of Fact, Nos. 50–51.)

On September 9, 1994, the Prevailing Wage Division of the Pennsylvania Department of Labor and Industry issued a determination concluding that the PNI project was not subject to the Pennsylvania Prevailing Wage Act (Wage Act).[11] The trades councils filed a grievance with the Board, which concluded, *inter alia*, that the PNI project was subject to the Wage Act because the City's asbestos removal project, completed before the "bare ground" was conveyed to PNI, was paid for out of public funds, making it a "public work." [12]

An appeal was taken to this court, which affirmed the Board's decision. In affirming the decision, we offered the following rationale:

8. The total cost of construction for the PNI project was $32.4 million, and the largest source of financing was a $23.5 million loan from PNI to PNRT, which was secured by a mortgage. (Findings of Fact, Nos. 64–65.)

9. The participating taxing bodies collect (1) the base real estate tax (the tax payable based on the value of the property when the tax increment district was created) and (2) the tax increment (the tax payable based on the value of the property with its improvements). Section 7(b) of the TIF Act, 53 P.S. § 6930.7(b).

10. The TIF Act provides that, on the "next settlement date provided by law," the taxing bodies pay the tax increment to the issuing authority. Section 7(b) of the TIF Act, 53 P.S. § 6930.7(b). Positive tax increments are allocated to the issuing authority each year until the issuing authority has no more monetary obligations. Section 7(a) of the TIF Act, 53 P.S. § 6930.7(a). At that time, the tax

Once the City accept[ed] money from PNI on behalf of the public for payment of the [asbestos removal] contract, the PNI money, in essence, belong[ed] to the public. Thus, the removal of asbestos ... [was] paid for in part out of the funds of a public body, making the entire project a public work under the [Wage] Act.

*Pennsylvania National Mutual Casualty Insurance Co. v. Department of Labor and Industry, Prevailing Wage Appeals Board*, 667 A.2d 753, 756 (Pa.Cmwlth. 1995), *rev'd in part*, 552 Pa. 385, 715 A.2d 1068 (1998) (hereinafter *Pennsylvania National I*).

Our supreme court reversed in part. The court agreed that the City's asbestos removal project was a "public work." However, because the asbestos removal project was completed before the City conveyed the project site to PNI, the court held that it was error to conclude that the *entire* PNI project was a public work. The court stated that, to determine whether the PNI building project is a public work, it is necessary to examine whether PNI paid for it in whole or in part with public funds.[13] The court remanded the case to the Board to address whether the Wage Act applies to the entire PNI project because it was financed under the TIF

increment district is terminated. Section 8 of the TIF Act, 53 P.S. § 6930.8.

11. Act of August 15, 1961, P.L. 987, *as amended*, 43 P.S. §§ 165–1 to 165–17.

12. Section 5 of the Wage Act states: "Not less than the prevailing minimum wages ... shall be paid to all workmen employed on public work." 43 P.S. § 165–5. Section 2 of the Wage Act defines a public work, in pertinent part, as demolition "done under contract and paid for in whole or in part out of the funds of a public body...." 43 P.S. § 165–2.

13. Although the court stated that there are four elements to the "public work" test, the only element for our consideration here is whether the work was paid for in whole or in part with public funds.

Act, the Urban Redevelopment Law [14] and/or the Housing and Redevelopment Assistance Law. *See Pennsylvania National Mutual Casualty Insurance Co. v. Department of Labor and Industry, Prevailing Wage Appeals Board*, 552 Pa. 385, 715 A.2d 1068 (1998) (hereinafter *Pennsylvania National II*).

On remand, the parties entered a stipulation of facts, and the Board took testimony on the matter. Afterward, the Board concluded that the Wage Act does *not* apply to the PNI building project because the construction was *not* paid for in whole or in part out of the funds of a public body.[15]

On appeal, the trades councils argue that the Board erred in concluding that the Wage Act does not apply here. The trades councils contend that the Wage Act applies to the PNI construction work because it was paid for in whole or in part out of the funds of a public body. The trades councils point out that, under the TIF Act, PNRT pays real estate taxes to the local taxing bodies, which pay the tax increments to PNC Bank for payment on the bonds issued to pay for the construction work. We agree with this argument.

It is clear that the TIF Act contemplates the expenditure of public monies on "public works" through tax increment financing. Indeed, a municipality might actually appropriate monies from its general fund to assist in paying the costs of a TIF project.[16] Moreover, section 9(i)(1) of the TIF Act specifically states that a lien may be created to guarantee TIF bonds issued to finance "public works." 53 P.S. § 6930.9(i)(1).

When our supreme court remanded this case to the Board, the court specifically asked the Board to consider "whether tax monies were merely forgone or whether these monies were actually collected by public entities and redistributed...." *Pennsylvania National II*, 552 Pa. at 399 n. 11, 715 A.2d at 1075 n. 11. Here, the taxing bodies actually collect the tax increments from PNRT and, later, pay the tax increment to PNC Bank, trustee of the tax increment fund. Thus, for a period of time, the money exists in public treasuries. Then, literally, the money is paid "out of the funds of a public body" into the tax increment fund.

The fact that the taxing bodies *must* pay the money into the tax increment fund does not alter the character of the money once it has been collected as taxes and deposited in the public treasuries. Indeed, we have great difficulty conceiving of the tax increment dollars as private funds, rather than public funds, while they rest in the public coffers. The only reason that the taxing bodies must pay the tax increment dollars into the tax increment fund is because the taxing bodies agreed to do so when they resolved to participate in the

---

**14.** Act of May 24, 1945, P.L. 991, *as amended*, 35 P.S. §§ 1701–1719.1.

**15.** The Board also concluded that the construction work was not done pursuant to a public contract. However, our supreme court did not ask the Board to consider that issue. The supreme court's decision states: Therefore, we remand this case to the Board ... to make specific findings of fact and conclusions of law regarding whether the [Wage] Act applies to the entire PNI building project because it is financed under the Tax Increment Financing Act, the Urban Redevelopment Act, and/or the Housing and Redevelopment Assistance Law.
*Pennsylvania National II*, 552 Pa. at 399, 715 A.2d at 1075. The court certainly did *not* ask

the Board to consider whether a public contract was involved here. Indeed, the supreme court already had addressed that issue in its decision, stating clearly that the construction work was done "under contract" and, therefore, meets that element of the definition of a "public work." *Pennsylvania National II*, 552 Pa. at 397, 715 A.2d at 1074.

**16.** The taxing bodies may appropriate monies for the project from their general fund. Section 7(c) of the TIF Act, 53 P.S. § 6930.7(c). When that occurs, the issuing authority deposits the appropriated monies along with the tax increments into the tax increment fund, from which money is disbursed to pay for the project. *Id.*

tax increment district.[17]  In effect, when the taxing bodies agreed to participate in the district, they allocated their tax increment dollars to pay for the TIF project.

Because the PNI project is paid for in part "out of funds of a public body," the entire PNI project is a "public work" under the Wage Act. Thus, the Wage Act applies in this case.  Accordingly we reverse.

### ORDER

AND NOW, this 11th day of January, 2001, the order of the Pennsylvania Prevailing Wage Appeals Board, dated April 14, 2000, is hereby reversed.

**17.**  One or more of the taxing bodies might have opted *not* to participate in the tax increment district.   53 P.S. § 6930.5(a)(7).