808 A.2d 881

PENNSYLVANIA STATE BUILDING AND CONSTRUCTION
TRADES COUNCIL, AFL–CIO, and Central
Pennsylvania Building Trades Council

v.

PREVAILING WAGE APPEALS BOARD,

Appeals of Commonwealth of Pennsylvania, Department of Labor
and Industry, Bureau of Labor Law Compliance, Intervenor (at
59/01) and Pennsylvania National Mutual Casualty Insurance
Company, Intervenor (at 60/01).

Supreme Court of Pennsylvania.

Argued Sept. 11, 2001.

Decided Aug. 22, 2002.

Reargument Denied Oct. 31, 2002.

Roger H. Caffier, Kenneth Scott Roy, Richard C. Lengler, James M. Sheehan, Harrisburg, for appellant, Bureau of Labor Law Compliance in No. 59 MAP 2001.

Thomas L. Wenger, David Russell Getz, Harrisburg, for appellant amici curiae, Pa. St. Assoc. of Tp. Sup'rs, et al. in No. 59 MAP 2001.

Stager Clay Smith, Blue Bell, Lee C. Schwartz, Harrisburg, for appellee, Prevailing Wage Appeal Bd. in No. 59 MAP 2001.

John T. Kupchinsky, Irwin William Aronson, Camp Hill, for appellees, Pa. St. Bldg. & Const., et al. in No. 59 MAP 2001.

Diane Marie Tokarsky, Harrisburg, Eric N. Athey, Lancaster, for intervenor PA Nat. Mut. Cas. Ins. Co. in No. 59 MAP 2001.

Diane Marie Tokarsky, James William Kutz, Harrisburg, Eric N. Athey, Lancaster, for appellant PA Nat. Mut. Cas. Ins. Co. in No. 60 MAP 2001.

Thomas Richard Davies, Lancaster, for appellant amicus curiae, Keystone Chapter, Associated Builders and Contractors, Inc. in No. 60 MAP 2001.

Stager Clay Smith, Blue Bell, for appellee, Prevailing Wage Appeal Bd. in No. 60 MAP 2001.

Roger H. Caffier, Kenneth Scott Roy, Richard C. Lengler, James M. Sheehan, Harrisburg, for intervenor, Bureau of Labor Law Compliance in No. 60 MAP 2001.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

Chief Justice ZAPPALA.

This case is before the Court, following remand, for a determination of whether Pennsylvania National Mutual Casualty Insurance Co.'s (PNI) use of tax increment financing pursuant to the Tax Increment Financing Act, 53 P.S. §§ 1661–1676 (TIF Act), to fund, in part, the construction costs of its office tower and parking garage facilities makes such project a "public work" for purposes of the Prevailing Wage Act (Wage Act), 43 P.S. §§ 165–1–165–17. The Commonwealth Court held that the use of tax increment financing does implicate the Prevailing Wage Act, and thus, requires the payment of prevailing wages. We agree, and, accordingly, affirm.

Sometime in late 1991, PNI, a Pennsylvania mutual insurance company, determined that its existing headquarters, within the city of Harrisburg (City), were inadequate. Thus, PNI began to explore the feasibility of moving its facilities, and up to 900 employees, to a new suburban location. The city's mayor, Stephen Reed, made several proposals to PNI in an attempt to make PNI's remaining in the city a viable option. The first two proposals did not include tax increment financing and PNI rejected them. The third proposal that Mayor Reed offered included tax increment financing and sites for PNI's construction of an office tower and parking garage at a central downtown location. PNI accepted this proposal.

Thereafter, the City and/or the Harrisburg Redevelopment Authority (HRA) entered into a Development Agreement with PNI dated January 24, 1994. Pursuant to the agreement, the City and HRA were responsible for site preparation following which they were to convey to PNI the project site as bare

ground. In order to do this, the City and HRA first had to acquire the properties that made up the project site and demolish existing structures on those properties.

Over the course of several years, the City and/or HRA acquired a number of properties in downtown Harrisburg. The City's land acquisition costs were financed partially by a $1,500,000 Economic Development Partnership (EDP) grant issued to the City by the Pennsylvania Department of Commerce under the Housing and Redevelopment Assistance Law, 35 P.S. §§ 1661–1676. Initially, the City intended to apply some of the EDP grant toward the demolition costs, however, since the actual land acquisition costs exceeded prior estimates, all of the EDP grant was applied toward the cost of land acquisition and administration of the grant.[1]

Once the land acquisition phase of the project was completed, as part of the site preparation, the City began to ready the site for construction. Thus, the City entered into a $109,000 asbestos removal contract with CMC Environmental Hazard Abatement, Inc. It also entered into an agreement with a demolition contractor to perform site preparation work other than the asbestos removal.

Pursuant to the Development Agreement, once demolition was completed, the City conveyed the "bare ground" to PNI and PNI constructed its new headquarters and parking garage. Construction of the office tower and garage was financed, in part, pursuant to the TIF Act. The City, the County of Dauphin and the Harrisburg School District (collectively, the taxing bodies) approved the creation of a tax increment district pursuant to Section 5 of the TIF Act, 35 P.S. § 6930.5, and, by adopting resolutions to that effect, agreed to participate in the tax increment district.[2]

1. As noted the EDP grant was used exclusively for land acquisition and, thus, was not used "by the City or any other entity toward construction, reconstruction, demolition or alteration and/or repair work on the Project site." Final Decision and Order of the Prevailing Wage Appeals Board, Finding of Fact 20 at 6.

2. Section 5(a)(7) of the TIF Act specifies that "the governing body of a municipality or school district that levies property taxes within the boundaries of a proposed tax increment district shall, by ordinance or

Thereafter, the Prevailing Wage Division of the Pennsylvania Department of Labor and Industry, by letter dated September 9, 1994, issued a determination concluding that the PNI building project, in its entirety, was not subject to the Wage Act. This decision was the subject of our prior opinion in this case and, therein, we stated the following regarding the procedural history of the matter:

On September 13, 1994, the Pennsylvania State Building and Construction Trades Council, AFL–CIO and the Central Pennsylvania Building Trades. Council (the "Unions"), which are councils of labor unions representing employees in the building and construction industry throughout Pennsylvania and central Pennsylvania, respectively, filed a grievance with the Board, pursuant to 43 P.S. § 165.2.2(e)(1) of the Act, regarding the Division's determination.

After consideration of a joint request for expedited relief, the Board, by order dated October 18, 1994, inter alia, set a briefing schedule, and ordered that the parties address the issue of whether the Unions had standing to challenge the Division's determination in this case. Subsequently, PNI, the City and HRA intervened in the grievance proceedings in support of the Division's position. Although the parties could not agree on stipulated facts, an evidentiary hearing was not held; only documentary evidence was presented for the Board's consideration. The Board heard oral argument on November 3, 1994 and rendered a decision and order on January 13, 1995.

In its unanimous decision reversing the Division's determination, the Board concluded that the Unions had standing to file their grievances and that because the asbestos removal constituted "public work" as defined in the [Wage] Act, the [Wage] Act applies to the entire PNI building project. Appellants appealed this determination and the Division filed a separate appeal of the Board's order. The Commonwealth Court consolidated the appeals, and affirmed the Board's order.

resolution, agree to participate or opt not to participate in whole or in part in the tax increment district."

*Pennsylvania National Mutual Casualty Ins. Co. v. Department of Labor and Industry,* 552 Pa. 385, 715 A.2d 1068, 1070 (1998) (footnote omitted).

Our Court granted allowance of appeal, limited to the following three issues: 1) whether the Unions had standing to file a grievance in this case; 2) whether the Wage Act applies to the entire building project because public bodies initially paid for the asbestos removal project; and 3) whether the Wage Act applies to the entire building project because it is financed under the TIF Act, the Urban Redevelopment Act, or the Housing and Redevelopment Assistance Law.

In our decision, we concluded that the Unions had standing to file their grievance in this case. Regarding the second issue, we noted the following:

43 P.S. § 165–5 of the [Wage] Act requires that:

Not less than the prevailing minimum wages as determined hereunder shall be paid to all workmen employed on public work.

Thus, only workmen who labor on "public work" must be paid the minimum prevailing wage. Section 2(5) of the [Wage] Act, 43 P.S. § 165–2(5), defines "public work" as:

Construction, reconstruction, demolition, alteration and/or repair work other than maintenance work, done under contract and paid for in whole or in part out of the funds of a public body where the estimated cost of the total project is in excess of twenty-five thousand dollars ($25,000), but shall not include work performed under a rehabilitation or manpower training program.

Therefore, we must look at the work performed on the PNI project to determine whether it is deemed to constitute "public work," and, thus, subject to the Act. Initially, we note, as did the Board, that the fact pattern before us is unique. The circumscribed role of the City in the building project was to prepare and deliver vacant land. Once the City completed its contracts for asbestos removal and demolition, and conveyed the property to PNI, its limited involvement in the development of the property ceased altogether.

The City will evidently not be a party to any post-conveyance construction contract. *Other than possible state financing addressed in issue three below, no post-conveyance construction contracts will be paid for in whole or in part with public funds.* Thus, the factual scenario before us is unlike other situations in which a public body contracts for work which is to be paid for entirely with public monies.

Again, to constitute "public work" four elements must be satisfied:

(1) there must be certain work;

(2) such work must be under contract;

(3) such work must be paid for in whole or in part with public funds; and

(4) the estimated cost of the total project must be in excess of $25,000.

Under the facts of this case, the lower tribunals found that the $109,000.000 asbestos removal work met this definition. The asbestos removal was the kind of work covered by the Act, i.e., demolition work, it was under contract, and as determined by the lower tribunals, was paid for in whole or in part out of the funds of a public body. The $25,000 threshold was clearly met. The lower tribunals then found that because the asbestos removal constituted public work, the entire PNI building project, i.e., the remaining work, constituted public work for purposes of the Act.

*Id.* at 1073–74 (emphasis added).

We noted that the Board, in accepting the Union's argument, found that the Wage Act speaks to the "total project," and not individual contracts or phases, and establishes coverage where any work is public work. In rejecting this analysis, we noted the following:

We do not agree with the Board's interpretation of the definition of "public work." Assuming, arguendo, that the "total project" is the $30 million PNI building project, the term "total project," is referred to in the definition of "public work" only in the context of establishing a monetary threshold which excludes from coverage of the Act, projects

costing less than $25,000. We do not interpret this prong to confer public work status to work which otherwise fails to satisfy the other three elements of the definition of "public work." Rather, all elements of the definition must be satisfied for work to constitute "public work."

*Id.* at 1074. Thus, we concluded that "under the distinct facts of this case" that "the entire PNI building project is not covered by the [Wage] Act simply because asbestos removal was deemed to be public work." *Id.* at 1075.

In addressing the third issue, we noted that neither the Board nor the Commonwealth Court addressed the issue of statutory financing and whether or not its use implicated the Wage Act. We noted that the Board failed to conduct an evidentiary hearing and, thus, did not provide detailed factual findings regarding the use of statutory financing. In particular, we noted the following in this regard:

Specifically, no detailed findings of fact were made by the Board as to, inter alia, funding streams; what specific entities utilized tax monies and grants; for what specific work the tax and grant monies were used; the process through which tax increment bonds were issued and what role if any public entities played in the issuance of the bonds; what purpose interest income generated from the bonds is used for; what entities are ultimately responsible for payment of the bonds and debt service on the same; whether a public entity's credit was pledged in connection with the bonds; whether tax monies were merely foregone or whether these monies were actually collected by public entities and redistributed; and whether the public entity has access to such monies.

*Id.* n. 11. Thus, we remanded the matter to the Board to hold further proceedings, conduct an evidentiary hearing, and to make specific findings and conclusions of law regarding:

whether the [Wage] Act applies to the entire PNI building project because it is financed under the Tax Increment

Financing Act, the Urban Redevelopment Act, and/or the Housing and Redevelopment Assistance Law.[3]

*Id.*

Upon remand, the parties entered a stipulation of facts, and the Board conducted an evidentiary hearing. Thereafter, the Board issued its findings of fact and conclusions of law and, ultimately, its decision. The Board concluded that the Wage Act does not apply to the PNI building project because the construction contract was not paid for in whole or in part out of the funds of a public body, i.e., TIF Act financing does not implicate the use of public funds. The Board further concluded that because a public body was not a party to the construction contract, the project did not meet the definition of "public work" pursuant to the Wage Act.

The Commonwealth Court reversed, noting, first, that our remand did not ask the Board to consider the issue of whether a public body was a required signatory to the construction contract. The court went on to conclude that the use of TIF Act financing involved the use of public funds, which, in turn were used to partially fund the construction project.

While the Commonwealth Court concluded that this Court never asked the Board to consider the "contract" prong of the "public work" test, and, accordingly, did not address this issue, we did grant the parties' petition for allowance of appeal to address this issue. Thus, we consider review of this issue properly before our Court. Before addressing the merits of the lower tribunals' decisions, we first set forth the factual circumstances, and the statutory basis, for the TIF Act financing arrangement in this case.

As noted earlier, in conjunction with the use of TIF Act financing, the taxing bodies approved the creation of a tax increment district, and agreed to participate therein by adopting resolutions to that effect. Thereafter, as part of the

3. Because we conclude that the Wage Act is indeed implicated based upon TIF Act financing, we do not address the use of the Urban Redevelopment Act and/or the Housing and Redevelopment Assistance Law.

project plan,[4] HRA issued tax increment bonds in a gross amount of not less than $10,500,000. The bonds were a limited obligation of HRA, and, on their face, indicated that HRA does not pledge payment of the principal of, or interest on, the bonds. PNI purchased all of these bonds, which, pursuant to Section 9(d) of the TIF Act, mature over a period not to exceed twenty years from the date of issue. The proceeds from the sale of the bonds were held in trust under an indenture and were disbursed by PNC Bank, the trustee, to PNRT, to pay a portion of the construction costs of the project.[5] The bonds were secured by a mortgage and security agreement between PNRT, as mortgagor, and PNC Bank, as mortgagee, on the office building and parking garage.

Pursuant to the TIF Act, the bonds are payable from positive tax increments [6] that have been deposited in an established tax increment fund.[7] The tax increment fund is a fund into which are paid all tax increments and all revenues from the sale of tax increment finance bonds or notes and from which money is disbursed to pay project costs for the district or to satisfy claims of holders of tax increment bonds or notes.[8]

In this case, PNRT, as owner of the project buildings, was responsible for paying the real estate taxes on the property to the taxing bodies. Thus, PNRT was responsible for paying to the taxing bodies both the base real estate tax on the property and the tax increment on the property. In turn, the taxing bodies were required to pay over to the issuing authority (here

4. A municipality creating a tax increment district, approves a project plan in conjunction therewith pursuant to section 5 of the TIF Act, 53 P.S. § 6930.5.

5. 53 P.S. § 6930.9(a) specifies that "[p]ayment of project costs may be made by ... [p]ayment out of a municipalities general funds," or "payment out of the proceeds of the sale of tax increment bonds or notes."

6. Generally, this term is defined as "the incremental tax revenues, determined with reference to the tax incremental base, resulting from the increase in property values or from the increase in commercial activity as a result of a project."

7. 53 P.S. §§ 6930.9(b)(1) and 9(h).

8. 53 P.S. § 6930.3.

HRA) that portion of the collected tax monies that represent the tax increment.[9] As noted earlier, these monies are then used to pay off the tax increment bonds, the proceeds of which were used to pay construction costs for the project.

The Commonwealth Court, in concluding that the use of TIF Act financing implicates the Wage Act, found the foregoing statutory scheme significant. Specifically, the court noted that this Court had directed the Board, on remand, to consider, among other things, "whether tax monies were merely forgone or whether these monies were actually collected by public entities and redistributed...." *Pennsylvania State Bldg. & Constr. Trades Council, AFL–CIO v. Prevailing Wage Appeals Bd.,* 767 A.2d 605, 608 (Pa.Cmwlth.2001) (*citing Pennsylvania National,* 715 A.2d at 1075 n. 11). In this regard, the Board set forth the following applicable findings of fact:

> 53. At no time during the TIF payment process do the tax increment payments made by PNRT enter public coffers, nor could any public body lay claim to the tax increment payments or attempt to appropriate the monies because a trust is imposed on the payments.
>
> * * *
>
> 56. TIF financing does not involve any expenditure of public funds by any public body, since the taxing bodies merely disclaim, for a period of time, any right to the increased revenues which, but for the TIF project, would not exist.

Board's Final Decision and Order at 15–16.

The Commonwealth Court, relying upon the statutory framework of the TIF Act and apparently concluding that the

---

**9.** Pursuant to Section 7(b) of the TIF Act, 53 P.S. § 6930.7(b),

> the finance officer for the municipality which created the district and the finance officer for any municipality or school district which participates in a tax increment district shall, on the next settlement date provided by law, pay over to the issuing authority, out of all such taxes which have been collected, that portion which represents the tax increment allocable to the issuing authority.

Board's findings lacked support in the record, noted the following in this regard:

Here, the taxing bodies actually collect the tax increments from PNRT and, later, pay the tax increment to PNC Bank, trustee of the tax increment fund. Thus, for a period of time, the money exists in public treasuries. Then, literally, the money is paid "out of the funds of a public body" into the tax increment fund.

The fact that the taxing bodies must pay the money into the tax increment fund does not alter the character of the money once it has been collected as taxes and deposited in the public treasuries. Indeed, we have great difficulty conceiving of the tax increment dollars as private funds, rather than public funds, while they rest in the public coffers. The only reason that the taxing bodes must pay the tax increment dollars into the tax increment fund is because the taxing bodies agreed to do so when they resolved to participate in the tax increment district.[17] In effect, when the taxing bodies agreed to participate in the district, they allocated their tax increment dollars to pay for the TIF project.

---

[17] One or more of the taxing bodies might have opted *not* to participate in the tax increment district. 53 P.S. § 6930.5(a)(7).

*Pennsylvania State Bldg. & Constr. Trades Council, AFL–CIO v. Prevailing Wage Appeals Board,* 767 A.2d 605, 608-9.

■ On appeal, PNI essentially argues the position taken by the Board in its decision and maintains that because the taxing authorities never have access to TIF tax increment payments, because there is no risk whatsoever to the public bodies for, *inter alia,* repayment of the bonds and because, but for the creation of the TIF district, the increment payments would not exist, TIF financing does not implicate the Wage Act since the funds are not in whole or in part funds of a public body. Appellee's argument, on the other hand, mirrors the decision reached by the Commonwealth Court regarding the nature of the funds as "public funds" and

maintains that the use of such public dollars implicates the Wage Act. As did the Commonwealth Court, we find support in the statutory scheme, as well as the record, for the conclusion that the money at issue constitutes public funds for purposes of triggering the Wage Act.

In reviewing the record, the testimony of David B. Disney, counsel to PNI on the financial structure of the project, is relevant. He testified generally, regarding the statutory scheme set forth in the TIF Act, as well as specifically regarding the financing arrangement here. On direct examination, he testified, in relevant part, as follows:

A. Actually, under the TIF statute when PNRT pays its taxes, they will [go] to the taxing body and then they go over to PNC. There's a date set in the statute when those payments have to be made. There's a trust created on those monies so that the taxing bodies, again, have foregone a title interest to them. But they go to the taxing bodies then they're paid over to PNC, the trustee of the bonds. Then the monies are held in an account, in a bond fund, and they're used to pay the principal in interest.

Chairman Smith: So just so I can understand, that money then goes back to PNI to pay off the bonds that it purchased?

A. Right, right.

Chairman Smith: Okay. And out of all of that the public bodies are just—this is a loop that's being done, they just happen to be a segue in the loop the move because of a statutory provision. They have to be there for this particular type of financing.

A. Yes.

Chairman Smith: But they, in fact—this is all money that's just coming just in a circle. And I'm not trying to say that that's—that that's the way—but that's the way it's working.

A. That's the way the statutes are set. Although remember the taxing bodies are still getting their existing tax rates. But in other words they haven't—they still get that during the term of the life of the bonds.

Board hearing, Notes of Testimony, December 1, 1998 at 84–86.

On cross, Mr. Disney further testified as follows:

Q.  Now, you testified with respect to this scheme that the taxing bodies agree, and I'm quoting you now, that they will only receive the tax paid base, that they will forego the tax increment increase?

A.  Correct.

Q.  Now, the taxes however on the incremental increase in the value of the property are indeed paid by the property owner;  are they not?

A.  Correct.

Q.  And they're paid to the taxing body;  are they not?

A.  Correct.

*Id.* at 118–19.

Finally, Mr. Disney testified as to how the scheme set up by the TIF Act differs from tax abatement.

Q.  But before we get to the tax increment financing statute there is a statute as you've described previously in response to my questions that's passed by this taxing body who voluntarily agreed participate in this particular arrangement?

A.  There is an ordinance or whatever.

Q.  However we style it.  That's why I used the broader term statute?

A.  Right.

Q.  And in passing that ordinance that taxing body is agreeing to the conditions of the tax increment financing statute;  isn't that correct?

A.  Yes.

Q.  And those conditions include collecting that tax;  isn't that correct?

A.  I believe so, yes.

Q.  That would be in contrast, for example, with a tax abatement, would it not be, where the tax [is] never paid?

A. That's correct.

\* \* \*

Q. How does this financing scheme differ from a tax abatement?

A. In tax abatement there would not be a payment made to any entity. In this scheme there is a payment made to the taxing bodies which is impressed with a trust and a lien that must be made in favor of the PNC, the bond trustee. Attorney Shoop: Also the tax is paid on the level of the property value at the time that it's declared—

A. Correct.

*Id.* at 121–23.

Based upon the statutory scheme and the foregoing testimony, in our view, the monies paid to the taxing authorities as tax increments, which, in turn, are used to pay off the bonds that are used to pay the cost of construction are public funds for purposes of the Wage Act. As noted above, pursuant to the TIF Act, the taxing bodies actually collect the tax increment dollars in question. Although the taxing bodies only retain the monies paid on the property's tax base and the tax increment dollars are paid over to the trustee to be used to pay off the tax increment bonds, nevertheless, as noted by the Commonwealth Court, for a time these monies do rest in the public coffers.[10] Significantly, the statutory financing at issue here is not a tax abatement, where the taxing authority agrees to forego receiving property taxes on a certain property for a certain time. To the contrary, the tax money is actually collected by the taxing bodies, and, in turn, these dollars are used to pay off the tax increment bonds that are used to pay the cost of construction on the project.

■   Although we conclude that the work, i.e., the cost of construction, at issue here was "paid for in whole or in part with public funds," for purposes of the Wage Act, our inquiry

___

**10.** Moreover, as was noted by the Commonwealth Court, one or more of the taxing bodies might have opted *not* to participate in the tax increment district. 53 P.S. § 6930.5(a)(7). In that case, the taxing body would be entitle to the tax on the increased property value.

does not end since the Board also concluded that this portion of the project failed to meet the "work must be under contract" prong of the Wage Act test. Specifically, as noted previously, the Board concluded that because a public body was not a party to the construction contracts at issue, the project did not meet the definition of "public work" pursuant to the Wage Act.[11] In reaching this conclusion, the Board examined the language of Section 2(5) of the Wage Act, defining public work, and concluded that although the Act provides that the work in question be done "under contract" that what the term really means is work done "under contract with a public body." We disagree.

As noted, Section 2(5), plainly states that the definition of public work applies to work, otherwise meeting the statutory requirements, done "under contract." As there is no ambiguity in the meaning of the provision, statutory interpretation, as conducted by the Board, was not warranted. Section 1921(b) of the Statutory Construction Act, 1 Pa.C.S. § 1921(b), mandates that "when the words of a statute are clear and free from all ambiguity, the letter of it is not be disregarded under the pretext of pursuing its spirit." This, however, is exactly what the Board has done.

Because we conclude that the work at issue here was done "under contract," and otherwise meets the statutory definition of "public work" for purposes of the Wage Act, pursuant to Section 165–5 of the Wage Act, "[n]ot less than the prevailing minimum wages . . . shall be paid to all workmen employed on [such] public work." Accordingly, the order of the Commonwealth Court is affirmed.

Former Chief Justice FLAHERTY did not participate in the decision of this matter.

Justice SAYLOR files a dissenting opinion in which Justice CASTILLE joins.

11. The Commonwealth Court did not address this determination of the Board in its decision, concluding that our initial remand did not seek the Board's answer to this question. This Court, however, granted allowance of appeal to address this issue.

Justice SAYLOR dissenting.

The central issue in this appeal can be framed as whether, in creating an indirect financing mechanism to encourage economic development and revitalization of urban communities, the General Assembly intended to convert otherwise private development projects into public ones for purposes of prevailing wage precepts. The administrative agencies charged with the implementation of both salient statutory schemes have concluded that the Legislature did not intend to temper the benefits of tax increment financing by implicating prevailing wage obligations that are imposed in connection with public works. Since I believe that the agencies' interpretation, followed by the Prevailing Wage Board in this case, is a reasonable one that comports with a comprehensive assessment of the relevant enactments, I must respectfully dissent.

The core requirement of the Prevailing Wage Act, 43 P.S. §§ 165–1–165–17, is that all workers employed on "public works" must receive the prevailing wage as calculated pursuant to the enactment, *see* 43 P.S. § 165–5; the salutary aim is to protect workers employed on public projects from substandard compensation. *See generally Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Commonwealth of Pa., Dep't. of Labor and Indus., Prevailing Wage Appeal Bd.,* 552 Pa. 385, 394, 715 A.2d 1068, 1072 (1998). As Appellant, Commonwealth, Department of Labor and Industry, Bureau of Labor Law Compliance (the "Bureau"), in particular emphasizes, the substantive requirements of the Prevailing Wage Act are directed to governmental and not private entities,[1] lending some support

---

1. *See, e.g.,* 43 P.S. § 165–3 (addressing the "specifications for every contract" to which any "public body is a party"); 43 P.S. § 165–4 (describing the "duty of every public body which proposes the making of a contract for any project of public work"); 43 P.S. § 165–6 (granting "the public body awarding the contract" the right to inspect the records of contractors and subcontractors); 43 P.S. § 165–10(a), (b) (placing certain duties on public bodies and their officers with regard to requiring certifications of compliance with the Prevailing Wage Act); 43 P.S. § 165–11(a), (c) (referring to "any public body having public work performed" and imposing certain notification duties on the "fiscal or financial officer" of "any public body"); 43 P.S. § 165–12 (empowering the Secretary of Labor and Industry to direct the "public body" to

to Appellants' contention that the enactment simply was not intended, as a matter of general application, to govern private development projects.

Nevertheless, in alignment with the majority's analysis, it is also essential to consider, under the definition ascribed by the Legislature to the term "public work," which includes (with limitation) construction "done under contract and paid for in whole or in part out of the funds of a public body," 43 P.S. § 165–2(5), whether tax increment financing in and of itself entails public funding for construction for purposes of the Prevailing Wage Act.

The Tax Increment Financing Act, 53 P.S. §§ 6930.1– 6930.13, permits a private developer, with the cooperation of involved taxing bodies, to apply increases in real estate tax value of a qualified project site (tax increments) toward development costs, *see* 53 P.S. §§ 6930.5, 6930.6, 6930.7. By consenting to participate in a tax increment financing district, the taxing bodies agree to temporarily forego revenue increments that would otherwise result from improvements to the property. *See* 53 P.S. §§ 6930.7, 6930.9(d). The method by which the tax increments are applied to construction costs is described in the testimony as a financing "loop." A local government authority may issue tax increment bonds, the proceeds of which can be used to pay development costs, *see* 53 P.S. § 6930.9(2); in the present case, this occurred via a loan to the project owner (a PNI subsidiary). As work progresses, the project owner must tender to the taxing bodies both the base real estate tax (the predevelopment amount), as well as the tax increment resulting from improvements. The taxing entities retain the base tax as revenues but are required to allocate and furnish the increments to the issuing authority, *see* 53 P.S. § 6930.7, which monies can be disbursed for payment of the debt service for the bonds, *see* 53 P.S. § 6930.9(h), thereby completing the loop. In the present case, this is essentially what occurred (albeit through the involvement of the PNI subsidiary and various trustees).

terminate the contract of any person or firm found to have intentionally violated the Prevailing Wage Act).

Appellants point to several features of this scheme that are markedly different from public appropriation. First, direct payment of development costs is accomplished by the project owner (as occurred here), such that, to the extent that the taxing bodies' agreement to forego potential tax increments can be viewed as public financing, this occurs in the project background. The taxing bodies' statutorily prescribed role in terms of calculation, collection, temporary retention, and disbursement of increments is ministerial.[2] In conditioning prevailing wage obligations upon the payment of construction costs from public funds, Appellants argue, persuasively, that the General Assembly contemplated more direct and substantial involvement of a public body. Significantly, the financing arrangements were not structured in an effort to avoid prevailing wage obligations on an otherwise public project, *cf. Lycoming County Nursing Home Ass'n, Inc. v. Department of Labor and Industry,* 156 Pa.Cmwlth. 280, 289–91, 627 A.2d 238, 243–44 (1993), but as a consequence of utilization of a statutorily approved and endorsed method of facilitating private development and revitalization projects.

Further, as Appellants also emphasize, not only is the public aspect of funding indirect, but also, the source of the funds is unique and conditional. In these regards, as noted, tax increment revenues are treated separately from general revenues in that they are specifically allocated to debt service on tax

**2.** As framed by the Prevailing Wage Appeals Board:

The TIF statute specifically states that taxing bodies are not entitled to funds collected under the TIF statute. Rather, the taxing bodies are entitled to receive the established base tax only for the period that the district is in existence. The TIF Act establishes that taxing authorities must pledge TIF funds to the payment of the project only or payment of the TIF bonds. The TIF funds paid by the property owner (PNRT)[, Pennsylvania National Realty Trust, the PNI subsidiary,] when taxes are paid by PNRT, are forwarded directly from the taxing body to the TIF fund trustee. . . .
. . . The taxing bodies never receive title to the TIF funds, only retaining the base tax amounts. Thus, the TIF funds used for financing the construction project never actually enter public coffers since the taxing authorities have pledged these funds elsewhere. *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Pennsylvania State Bldg. and Constr. Trades Council, AFL–CIO,* PWAB–1G–1998, at 24 (April 11, 2000) (citations omitted).

increment financing bonds. *See* 53 P.S. § 6930.7(a); *supra* note 2. Moreover, their use is distinct from a present expenditure of public monies, since the increments would not likely exist but for the agreement of the taxing bodies to temporarily forego their prospective entitlement. *See* 53 P.S. § 6930.7(a), (b). The taxing entities receive and retain their base revenues, since the project owner remains responsible for the real estate taxes for the property as assessed prior to redevelopment. *See id.*[3] Tax increment monies therefore may be truly sole-purpose funds, as the record bears out in this case. *See, e.g., Pennsylvania Nat'l Mut. Cas. Ins.*, PWAB–1G–1998, FOF ¶ 7 (finding that "[w]ithout tax increment financing, PNI would not have remained in the city and would have relocated to a suburban location"). Additionally, as is apparent from the TIF Act, the opinion of the Prevailing Wage Appeals Board, and the testimony of record, the transaction imposes no risk to the taxing entities or any other public body. *See, e.g.,* 53 P.S. § 6930.9(h) (providing that, *inter alia,* "each bond or note shall contain recitals as are necessary to show that it is only so payable and that it does not constitute an indebtedness of any municipality or school district or a charge against the general taxing power thereof").[4]

3. It should be noted that taxing bodies do forego the opportunity for increased revenues in the event that the district were to be developed by others without the benefit of tax increment financing. The likelihood of such alternative development, however, is obviously part of the calculus which the taxing bodies must make in determining whether or not to cooperate in the affordance of the incentive. Moreover, this factor, in my view, is too speculative to serve as the basis for designating a project a public work.

4. This also is reflected in the findings of the Prevailing Wage Appeals Board:

37. No public body guaranteed is otherwise at risk should a default on the bonds occur; the sole party at risk is PNI as holder of the bonds.

38. No public body or authority guaranteed the bonds. The TIF financing statute prevents [the local government authority] from pledging its own assets or otherwise guaranteeing such financing.

39. PNI bears the risk of taxes being lowered to the point that [its subsidiary's] tax increment payments are insufficient to cover debt service on the bonds.

*Pennsylvania Nat'l Mut. Cas. Ins.,* PWAB–1G–1998, FOF ¶¶ 37–39 (citations omitted).

The substantial differences between funding via general public appropriations and tax increment financing persuade me that development accomplished by means of the latter should not be regarded as having been paid for from the funds of a public body and therefore as a "public work" for purposes of the prevailing wage enactment. Rather, in light of the unique, conditional, and directed character of the funding and the separate, salutary, incentive-based purposes involved, I believe that, had the General Assembly intended to implicate prevailing wage obligations in making tax increment financing available, it would have expressly so provided.[5] *Accord Foundation for Fair Contracting v. New Jersey State Dep't. of Labor—Wage and Hour Compliance Div.*, 316 N.J.Super. 437, 720 A.2d 619, 625 (App.Div.1998) (explaining, in light of legislative silence concerning prevailing wage obligations connected with certain remedial legislation aimed at economic revitalization: "The Legislature has apparently concluded that the goals expressed in the Fair Housing Act and the Long Term Tax Exemption Law, that is, to provide incentives to bring private developers into partnership with the government to create affordable housing in communities around the state; to improve conditions in certain run-down urban areas; and to maintain strict cost controls over such projects, take precedence over the goals of the Prevailing Wage Act.").

Finally, it bears on my assessment that this interpretation is in alignment with the reasonable administrative judgment of the Bureau, which is charged with enforcing the Prevailing Wage Act, and the Department of Community and Economic Development, which is charged with the carrying out of the Tax Increment Financing Act.[6] *See, e.g.,* 34 PA.CODE § 9.101(a). *See generally* 1 Pa.C.S. § 1921(c)(8) (identifying administrative interpretations as a viable tool in ascertaining

---

**5.** In this regard, in other instances in which the General Assembly has undertaken to enlarge prevailing wage coverage, it has done so by express language. *See, e.g.,* 24 P.S. § 17–1715 A(10)(iii) (requiring the boards of trustees and contractors of charter schools to abide by the Prevailing Wage Act).

**6.** The agencies' positions are reflected in briefs filed in this Court and in the Commonwealth Court.

legislative intent); *accord Cherry v. Pennsylvania Higher Educ. Assistance Agency,* 537 Pa. 186, 188, 642 A.2d 463, 464 (1994) ("An interpretation by an agency charged with a statute's implementation is accorded great weight and will be overturned only if such a construction is clearly erroneous").

Justice CASTILLE joins this dissenting opinion.