627 A.2d 238

## LYCOMING COUNTY NURSING HOME ASSOCIATION, INC., Petitioner,

v.

## COMMONWEALTH of Pennsylvania, DEPARTMENT OF LABOR AND INDUSTRY, PREVAILING WAGE APPEAL BOARD, Respondent,

## LYCOMING COUNTY, Petitioner,

v.

## DEPARTMENT OF LABOR AND INDUSTRY, PREVAILING WAGE APPEAL BOARD, Respondent.

Commonwealth Court of Pennsylvania.

Argued March 29, 1993.

Decided June 15, 1993.

282

J. Freedley Hunsicker, Jr., for petitioner, Lycoming County Nursing Home Ass'n, Inc.

Joanne C. Ludwikowski, for petitioner, Lycoming County.

Jane Pomerantz, Asst. Counsel, for respondent.

John T. Kupchinsky, Deputy Chief Counsel, for intervenor-respondent, Dept. of Labor and Industry, Prevailing Wage Div.

Irwin W. Aronson, for intervenor Central Pennsylvania Building and Const. Trades Council, AFL–CIO.

Before PELLEGRINI and FRIEDMAN, JJ., and NARICK, Senior Judge.

NARICK, Senior Judge.

Lycoming County Nursing Home Association, Inc. (Association) and Lycoming County (County) petition for review of an order of the Department of Labor and Industry's Prevailing Wage Appeal Board (Board) determining that the construction of a nursing home and personal care facility was a "public work," subject to the provisions of the Pennsylvania Prevailing Wage Act (Act).[1] We affirm.

1. Act of August 15, 1961, P.L. 987, 43 P.S. §§ 165–1—165–17.

During the 1980s the County decided to replace the old facility that had served its indigent patients since 1936. The Commissioners of Lycoming County (Commissioners) determined that the facility should not be owned and operated by the County, but by a separate entity. The Commissioners filed Articles of Incorporation on September 26, 1990, establishing the Association as a new, private, non-profit corporation that would build and operate the new facility. The incorporators and the members of the Association's Board of Directors (Directors) were the three Commissioners. In December 1990, the County loaned the Association $500,000 for initial start-up construction costs. The Association applied for and received a Certificate of Need from the Department of Health with the application identifying the County as the entity to whom the certificate should be issued. The Association also received tax-exempt status under the Internal Revenue Code.

In July 1991, ten months after its incorporation, the Association's bylaws were amended to provide for nine Directors. The Association's new Directors, appointed by the Commissioners, voted to eliminate the three positions reserved for the Commissioners. The three Commissioners resigned their Director positions and were reappointed as private citizens. Vacancies would be filled by majority vote of the nine Directors.

The Association solicited bids for the construction of the facility, awarding the contract to the lowest bidder on August 13, 1991; construction began immediately. None of the parties involved requested a prevailing wage determination, nor did they contemplate how the cost of paying the prevailing wage would affect the costs of the project.[2]

2.  A feasibility study, undertaken at the direction of the Commissioners, was conducted at the start of the project. It contemplated that the facility would be self-sustaining. To be economically feasible, the study stated that construction and operational costs must take into consideration the $22,000 per bed Medicaid reimbursement cap. The feasibility study envisioned cost recapture from private paying patients, who would make up 5–10% of the patient base, but did not include the costs

On September 26, 1991, the Association entered into a lease/loan agreement with the County. The Commissioners' chairman signed the agreement on behalf of the County and also executed the agreement on behalf of the Association as its president. Under the agreement, the County authorized the issuance of two series of General Obligation Bonds in the aggregate amount of $11,590,000 and then loaned the proceeds to the Association. The County remained liable for repayment to bondholders if the Association defaulted. In return, the Association agreed to construct and run the facility, retaining control over the day-to-day operations. The County leased the land to the Association for twenty-five years at $1.00 a year. All improvements on the land would become the property of the County when the agreement terminated.

Following an initial inquiry by the Prevailing Wage Division of the Department of Labor and Industry (PWD), the PWD notified the Association that the Act's provisions applied to the project. The Association and the County (collectively, Petitioners) appealed the PWD's determination to the Board.[3] After a *de novo* hearing, the Board concluded that the project was a "public work" subject to the Act, and that all workers on the project should have been paid no less than the prevailing minimum wage.

■ On appeal,[4] Petitioners raise the following issues: (1) whether the private, non-profit corporation, created by the County for the purpose of building and operating a nursing home for the benefit of County residents, is a "public body" subject to the Act; and (2) whether the Board erred in concluding that the Association is the "alter-ego" of the Coun-

of complying with the Act. However, under the final contract for construction, the cost was estimated at $24,000 to $25,000 per bed.

3. The Central Pennsylvania Building and Construction Trades Council, AFL–CIO, intervened and argued in support of PWD's decision.

4. Our scope of review is limited to a determination of whether constitutional rights have been violated, whether the adjudication was in accordance with the law, and whether the Board's findings of fact are supported by substantial evidence. 2 Pa.C.S. § 704.

ty, justifying the piercing of the corporate veil and deeming the project a "public work," subject to the Act.[5]

Petitioners argue that the Act only applies to contracts for "public work" to which a "public body" is a party, and that the Association is not an entity that falls within the definition of "public body" within the meaning of the Act.

Initially, we note that the Act sets out the following requirements:

The specifications for *every contract for any public work to which any public body is a party*, shall contain a provision stating the minimum wage rate that must be paid to the workmen employed in the performance of the contract.

Section 3 of the Act, 43 P.S. § 165–3.

Further,

It shall be the *duty of every public body which proposes the making of a contract for any project of public work* to determine from the secretary the prevailing minimum wage rates which shall be paid by the contractor to the workmen upon such project. Reference to such prevailing minimum rates shall be published in the notice issued for the purpose of securing bids for such project of public work. Whenever

**5.** The Board contends that Petitioners did not preserve issues for review as required by Pa.R.A.P. 2116(a) (statement of questions involved), because the issues raised in their briefs are not the same as those raised in their petition for review. We disagree. Pa.R.A.P. 1513(a) provides that a petition for review must contain among other items "a general statement of the objections to the order ... [which] will be deemed to include every subsidiary question fairly comprised therein." Furthermore,

a petition for review in the nature of an appeal addressed to the appellate jurisdiction of the court is a 'notice pleading' document, and the petitioner need only make a general statement of the objections to the order or determination sought to be reviewed. Those 'general objections' will be refined subsequently in the petitioner's brief on the merits as the statement of issues or statement of questions involved.

1 Darlington McKeon Schuckers and Brown, Pennsylvania Appellate Practice § 1513.5, pp. 352–53.

We do recognize that the issues set out and discussed in Petitioners' briefs do not encompass all the objections raised in their petition for review. To the extent that the issues in the petition for review are not subsumed in the issues discussed in the briefs, they are waived.

any contract for a project of public work is entered into, the prevailing minimum wages as determined by the secretary shall be incorporated into and made a part of such contract and shall not be altered during the period such contract is in force.

Section 4 of the Act, 43 P.S. § 165–4.

Also Section 5 of the Act, 43 P.S. § 165–5 states that "[n]ot less than the prevailing minimum wages as determined hereunder shall be paid to all workmen employed on public work."

Clearly the Act's purpose is to protect workers employed on public projects from substandard wages by insuring that they receive the prevailing minimum wage. *Kulzer Roofing, Inc. v. Department of Labor and Industry,* 68 Pa.Commonwealth Ct. 642, 450 A.2d 259 (1982). Moreover, the Act will apply when a "public body" contracts or proposes to contract for any project of "public work."

The Board found that the project entailed construction, done under contract, which would be paid for in whole or in part by public funds, and would cost over $25,000. Specifically, the Board found that the County loaned the Association $500,000 to cover start-up costs and issued bonds with the express purpose of lending the money to the Association to construct the project. Furthermore, the County remained responsible to the bondholders in the event that the Association failed to make repayment. The Association also leased the property for one dollar a year.

Petitioners, however, argue that because the Association actually paid for and contracted for the project, the public nature of the project was destroyed, taking it out of the realm of "public work." The Act defines "public work" as:

construction, reconstruction, demolition, alteration and/or repair work other than maintenance work, done under contract and paid for in whole or in part out of the funds of a public body where the estimated cost of the total project is in excess of twenty-five thousand dollars ($25,000), but shall

not include work performed under a rehabilitation or manpower training program.

Section 2(5) of the Act, 43 P.S. § 165–2(5).

The Board determined that the funds received by the Association from the County were public funds and did not change their public character because they were a loan to the Association. Thus, the Board concluded that the project was a "public work." We agree.

The definition for "public work" does not require that a "public body" must be directly involved with the project; only that the project must be paid for in whole or in part with public funds. The evidence here demonstrates that public funds paid for the project, thus, creating a "public work" as set forth in Section 2(5) of the Act.

Although Petitioners do not contest the obvious, that the County is a "public body," they do assert that the Association is not a "public body" to which the Act applies. The Act defines "public body" as:

the Commonwealth of Pennsylvania, any of its political subdivisions, any authority created by the General Assembly of the Commonwealth of Pennsylvania and any instrumentality or agency of the Commonwealth of Pennsylvania.

Section 2(4) of the Act, 43 P.S. § 165–2(4).

Petitioners cite to two attorney general opinions [6] which discuss the Act's applicability to construction projects financed by authorities organized under the Pennsylvania Industrial Development Authority Act (PIDAA).[7] Petitioners contend that these opinions espouse the notion that the receipt of public funds does not transform nonprofit corporations, such as the Association, into "public bodies."

PIDAA authorities are private local non-profit agencies that have not been organized by any political subdivision of the

6. Attorney General Opinion No. 252–1962 and Attorney General Opinion No. 28–1974.

7. Act of May 17, 1956, P.L. (1955) 1609, *as amended*, 73 P.S. §§ 301–314.

Commonwealth. Opinion No. 252–1962 holds that a PIDAA authority that merely provides loans for industry in economically depressed areas, but does not undertake construction or perform "public work," is not subject to the Act. Opinion No. 28–1974 holds that a PIDAA authority that becomes a party to the construction contract in addition to performing the financing function, is subject to the Act.

Petitioners argue that this case compares to No. 252–1962, because the County only provided financial resources to facilitate the project and was not a party to the construction contract, so that the Act does not apply. We do not agree.

■ The County here clearly was not *just* involved with the financing of the project. As No. 28–1974, however, notes, funds for a project, when obtained through the issuance of revenue bonds by the PIDAA authority for which it pledges its credit and must repay in the event of default by the private entity, are public funds when a public purpose is furthered. As the Board found, the County loaned money to the Association and remained liable on the bond if the Association defaulted. Moreover, the County leased the property to the Association. The County's Commissioners undertook the feasibility study, appointed themselves as Directors, and, as Directors, influenced the Association when it contracted for the building and the operating of the facility. In addition, construction began before the lease agreement for the land was signed and before the bonds were issued, indicating that the Commissioners knew that the outcome of the negotiations between them and the Association's Directors would be favorable.

Although the Association actually contracted for the construction of the project and undertook the responsibility of the day-to-day activities of the nursing home, the Board found that the funds were public funds and were intended to further a public purpose. Moreover, the Act applies even when a "public body ... *proposes* the making of a contract for any project of public work." Section 4 of the Act. Therefore, we hold that because the Association used public funds for a public purpose that was proposed by a "public body," it stands

in the shoes of the County, is a "public body" doing "public work" and is covered by the Act.

Petitioners next argue that the Board erred in holding that the Association is the alter-ego of the County, justifying the piercing of the corporate veil. In Pennsylvania, a corporation shall be regarded as an independent entity. *Longenecker v. Commonwealth*, 142 Pa.Commonwealth Ct. 130, 596 A.2d 1261 (1991) *petition for allowance of appeal denied*, 531 Pa. 656, 613 A.2d 561 (1992). Although a strong presumption exists against piercing the corporate veil, under certain circumstances a court may disregard the corporate entity. *Id.* Factors which may justify piercing the corporate veil include undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs, and use of the corporate form to perpetrate a fraud. *Id.*

In *Village of Camelback v. Carr*, 371 Pa.Superior Ct. 452, 461, 538 A.2d 528, 532–33 (1988) *aff'd*, 524 Pa. 330, 572 A.2d 1 (1990) (quoting *Ashley v. Ashley*, 482 Pa. 228, 237, 393 A.2d 637, 641 (1978)), the court set forth the standard for piercing the corporate veil as follows:

> The legal fiction that a corporation is a legal entity separate and distinct from its shareholders was designed to serve convenience and justice, ... and will be disregarded whenever justice or public policy require and where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless.... We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded.

A court will pierce the corporate veil on an alter ego theory when there is a showing of injustice after the establishment "that the dominant shareholder or the controlling corporation wholly ignored the separate status of a corporation and so dominated and controlled its affairs that its separate existence was a mere sham." *Wheeling–Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F.Supp. 1054, 1057 (W.D.Pa.1990).

■ The Board concluded that the presumption that the corporate entity should be maintained was rebutted by the evidence in this case. We agree. The Commissioners, and therefore the County, controlled the project from its inception. The attempts to disassociate the County from the Association did not overcome the fact that the Association was the instrumentality of the County.

■ We clearly do not wish to convey the idea that the Commissioners' acts were fraudulent. However, "the corporate existence can be disregarded without a specific showing of fraud," *Camelback*, 371 Pa.Superior Ct. at 462, 538 A.2d at 533, whenever it is necessary to avoid injustice or when public policy requires. *Id.*

We conclude that the public policy advanced by the Act would be defeated if we allow the County to rely on the independence of the Association. Moreover, by empowering the County to use the Association to build a project, such as the nursing home at issue here, we would condone the circumvention of the Act and its purpose.

Having determined that the Association is a "public body" doing "public work" and that the Association is the alter-ego of the County, allowing the piercing of the corporate veil, we conclude that the County must assume the responsibility of complying with the Act.

Accordingly, we affirm.

ORDER

AND NOW, this 15th day of June, 1993, the order of the Department of Labor and Industry's Prevailing Wage Appeal Board in the above-captioned matter is hereby affirmed.