IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ursinus College,                        :
                                        :
                    Petitioner          :
                                        :
        v.                              :  No. 828 C.D. 2021
                                        :  Argued:  June 22, 2022
Prevailing Wage Appeals Board,          :
                                        :
                    Respondent          :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION
BY JUDGE WOJCIK                                  FILED:  August 4, 2022


        Ursinus College (Ursinus) petitions this court for review of the order
of the Pennsylvania Prevailing Wage Appeals Board (Board) that reversed the
decision of the Department of Labor and Industry, Bureau of Labor Law Compliance
(Bureau), and concluded that the construction project undertaken by Ursinus
(Project) was "public work" under Section 2(5) of the Pennsylvania Prevailing Wage
Act (Act)[1] because it was "paid for in whole or in part out of the funds of a public

---

[1] Act of August 15, 1961, P.L. 987, *as amended*, 43 P.S. §§165-1 – 165.17.  Section 2(5)
of the Act, in relevant part, defines "public work" as

> construction . . . work, other than maintenance work, done under
> contract and **paid for in whole or in part out of the funds of a
> public body** where the estimated cost of the total project is in excess

**(Footnote continued on next page…)**

body." The public body here, the Montgomery County Higher Education and Health Authority (Authority), issued bonds to finance the Project. This dispute was brought before the Board when the International Brotherhood of Electrical Workers, Local No. 98 (IBEW) filed a grievance under the Act, alleging that the Project was public work subject to the Act, and seeking relief for its members in the form of prevailing wages for the Project work already completed.[2] Several *amici*[3] join with Ursinus to seek reversal of the Board's decision, arguing that the Board committed an error of law when it concluded that the Project was public work, when no Authority funds were used to pay for the Project, the Authority never held, disbursed, or guaranteed any Project funds, and the Authority was not reimbursed in any way from public funds, but merely served as a conduit for Ursinus' funding of a private Project.

Ursinus presents three issues for our review: whether the Board erred in concluding that the Project was subject to and covered by the Act; whether the

---

of twenty-five thousand dollars ($25,000), but shall not include work performed under a rehabilitation or manpower training program.

43 P.S. §162-2(5) (emphasis added).

[2] Although the Board is listed as respondent, IBEW, as intervenor, is the party-in-interest and filed a responsive brief in support of the Board's decision. The Bureau, as intervenor, filed a responsive brief only on the issue of whether the Board had authority to order retroactive relief in the form of prevailing wages, and whether retroactive relief is appropriate here.

[3] Keystone Chapter of Associated Builders and Contractors, Inc. (Builders), Pennsylvania Economic Development Association and seven county or regional development authorities (Development Authorities), Pennsylvania Chamber of Business and Industry, Pennsylvania Council of General Contractors, Leadingage, PA, Pennsylvania Waste Industries Association, and Pennsylvania Municipal Authorities Association (Chamber), and Bucknell University and seven other private colleges or universities in the Commonwealth (Private Universities) filed *amici* briefs in support of Ursinus as permitted by Pa. R.A.P. 531(b)(1)(i). The Authority is not a party to this appeal, nor did it file an *amicus* brief.

Board erred in finding that the process by which the Project was funded somehow converted the exclusively private funds used to pay for the Project into "funds of a public body" and the Project into "public work" when no funds ever passed through or otherwise touched the Authority or any other public bodies; and whether the Board's retroactive award of prevailing wages to workers on the Project over three years after the Project was completed should be upheld when the Board's award was a novel interpretation of the Act, and the Bureau determined the Act did not apply to the Project. After careful review, we reverse the Board's decision that the Project was public work subject to the Act. Because the Project is not subject to the Act, we do not reach the question of the Board's retroactive award of prevailing wages.

The relevant facts as found by the Board, based on the parties' stipulations, are as follows. The IBEW is a labor organization that represents workmen under the Act. Reproduced Record (R.R.) at 183a. Ursinus is a private, non-profit college. The Authority was created under the Municipality Authorities Act of 1945 (MAA),[4] and is authorized to issue bonds for projects conducted by eligible educational institutions, including Ursinus. R.R. at 183a. In 2016, Ursinus' board authorized Ursinus to pursue certain construction projects, including the Project, and to borrow up to $23 million to pay for a portion of the Project. *Id.* The Authority approved a resolution to issue the bonds for the Ursinus Project. *Id.* The Board included as exhibits the various bond documents including the Loan Agreement between Ursinus and the Authority (Loan Agreement), the Trust Indenture between The Bank of New York Mellon Trust Company, N.A. (Trustee) and the Authority (Trust Indenture), and the Bond Purchase Agreement between the

---

[4] Act of May 2, 1945, P.L. 382, *as amended*, *formerly* 53 P.S. §§301-322, repealed by Section 3 of the Act of June 19, 2001, P.L. 287. Similar provisions are now found in the consolidated Municipality Authorities Act, 53 Pa. C.S. §§5601-5623.

RBC Capital Markets, LLC (Underwriter) and Ursinus (Bond Purchase Agreement). *Id.* at 184a.

The Authority sold the bonds to the Underwriter. R.R. at 184a. The Underwriter paid the purchase price of the bonds to the "order of" the Authority, as reflected in the closing statements. *Id.* The bond transaction documents reflect the following steps in the transaction: the Authority sold the bonds to the Underwriter; Ursinus paid costs, fees, and expenses for the transaction; the Trustee deposited the bond proceeds into a project fund from which the Trustee disbursed project costs to Ursinus; Ursinus paid debt service on the loan to the Trustee; the Trustee deposited Ursinus' payments into a bond fund held by the Trustee; and the Trustee paid the bondholders directly from the bond fund. *Id.* at 184a-85a. The construction work on the Project exceeds $25,000, and the work to be performed on the Project is all under contract with Ursinus. *Id.* at 185a.

The Board made additional findings based on recitals from the resolutions and bond documents in the record as follows. The Loan Agreement recites "[s]imultaneously with the execution, and delivery of this Loan Agreement, the Authority has duly executed and delivered the [Trust] Indenture and issued and sold the bonds." R.R. at 39a, 187a. "The Authority agrees, upon the terms and conditions contained in this [Loan] Agreement, to lend to [Ursinus] the proceeds as provided in the [Trust] Indenture." *Id.* at 41a, 187a. The proceeds from the sale of the bonds shall be loaned to Ursinus pursuant to Section 3.01 [of the Loan Agreement] and such proceeds shall be paid over to the Trustee for application in accordance with the terms of the Trust Indenture. *Id.* By resolution dated November 1, 2016, the Authority assigned all rights, title, and interest in the Loan Agreement

4

to the Trustee. *Id.* at 70a-71a. In consideration of and in repayment of the loan, Ursinus shall make payments to the bondholders. *Id.* at 43a, 187a-88a.

From the Trust Indenture, the Board recited the following. The Authority is a public instrumentality of the Commonwealth established under the MAA, with the purpose of financing land and buildings for eligible public and private educational institutions. R.R. at 77a, 188a. The Authority authorized and approved the Project for the benefit of Ursinus, and authorized the issuance of $23 million in revenue bonds for the Project. *Id.* "The Authority has caused the [r]evenues to be paid directly to the Trustee pursuant to the assignment to the Trustee of the Loan Agreement." *Id.* at 95a.

From the Bond Purchase Agreement, the Board recited the following. Subject to the terms therein, the Underwriter agrees to purchase from the Authority, and the Authority agrees to sell, all of the Authority's bonds for the Project. R.R. at 137a, 189a. Pursuant to the Loan Agreement dated November 1, 2016, the proceeds of the bonds will be loaned to Ursinus for the Project. The Authority has full authority under the MAA to sell, issue, and deliver the bonds to the Underwriter. *Id.* at 140a, 189a. The Closing Statement, directed to the Trustee on November 22, 2016, dated after the bonds were issued and the funds transferred to the Trustee, directs the Trustee to make disbursements from the Project fund. *Id.* at 164a-65a, 189a-90a.

The Board then analyzed the relevant precedents, discussed below, and determined, in accord with the parties' agreement, that the Project satisfied three of the four required elements in *Pennsylvania National Mutual Casualty Insurance Company v. Department of Labor and Industry, Prevailing Wage Appeals Board*, 715 A.2d 1068 (Pa. 1998) (*Penn National I*), and the only area of dispute was

whether the Project was paid for in whole or in part with funds of a public body. R.R. at 193a. The Board summarized the parties' arguments, and was persuaded that because the Project was paid for with loans from the Authority, as per the Loan Agreement, the Project was paid for with funds of a public body. *Id.* at 196a. The Board interpreted *Pennsylvania State Building and Construction Trades Council, AFL-CIO v. Prevailing Wage Appeals Board*, 808 A.2d 881 (Pa. 2002) (*Penn National II*), to stand for the proposition that, if the funds used by Ursinus for the Project were "at any point in time 'funds of a public body[,]'" the Act applies. R.R. at 196a. The Board rejected the Bureau's analysis that because Ursinus must pay back the loan, public funds from the Authority are not "ultimately" being used to pay for the Project. *Id.* at 198a-99a. The Board reasoned:

> Although the Authority may not have directly paid for the [P]roject[], Ursinus would not have had this funding stream available but for the existence of the Authority and its coordination of the funding through its statutory powers as a public body. The fact that the funds wound their way through financing processes and contractual relationships with the Trustee and [the] Underwriter does not change the reality that the funds were only available because of the Authority's statutory ability to issue the [b]onds. The proceeds from the [b]ond sale did not lose their character as the "funds of a public body" just because the money journeyed through other nonpublic financial transactions.

*Id.* at 199a. Thus, the Board concluded that the Project was public work under the Act, and ordered all workers on the Project to be paid the applicable prevailing wage rate as determined by the Bureau. *Id.* at 200a. Ursinus then filed the instant petition for review.[5]

---

[5] This Court's scope of review is plenary, and the standard of review is limited to determining whether constitutional rights were violated, whether the Board committed an error of law, or whether necessary findings of fact were supported by substantial evidence. *York*

**(Footnote continued on next page…)**

The following is a review of the relevant case law interpreting Section 2(5) of the Act. In *Lycoming County Nursing Home Association, Inc. v. Department of Labor and Industry, Prevailing Wage Appeal Board*, 627 A.2d 238 (Pa. Cmwlth. 1993), our Court considered whether a construction project undertaken by the County and a non-profit corporation established by the County to build a new nursing home to serve indigent patients was public work subject to the Act. In that case, the County established a non-profit corporation to own and operate the new facility. *Id.* at 240. County commissioners were members of the non-profit's board, although they later resigned and were reappointed to the board as private citizens. *Id.* The non-profit entered into a lease/loan agreement with the County, under which the County authorized the issuance of $11.5 million in bonds to finance the project, and then loaned the proceeds to the non-profit. In that case, the bonds were issued by an authority, and the County remained liable for repayment to the bondholders if the non-profit defaulted. *Id.* at 240-41. The non-profit agreed to construct and operate the facility. The County leased the land for the facility to the non-profit for 25 years at $1 per year. All improvements to the land would become the County's property when the agreement ended. *Id.* Although the non-profit, and not the County, contracted to construct the facility, the Court held that the project was public work because the funds received by the non-profit from the County were public funds. *Id.* at 242.

The Court stated "[t]he definition for 'public work' does not require that a 'public body' must be directly involved with the project; only that the project must be paid for in whole or in part with public funds." *Lycoming County*, 627 A.2d at 242. The Court reasoned that the County was not just involved with the financing

*Excavating Company, Inc. v. Pennsylvania Prevailing Wage Appeals Board*, 663 A.2d 840, 842 n.4 (Pa. Cmwlth. 1995).

of the project through its initial loan to the non-profit, but it was the guarantor of the bonds issued by the authority, leased property to the non-profit, undertook a feasibility study, and influenced the non-profit board. Under those facts, the Court held that the project was funded by public funds. *Id.* at 243. The Court also held that, under those facts, the Court would pierce the corporate veil of the non-profit, because it was the County's alter ego for the project. *Id.* at 244.

In *Borough of Ebensburg v. Prevailing Wage Appeals Board*, 893 A.2d 181 (Pa. Cmwlth. 2006), our Court considered whether the Borough's curbing and sidewalk replacement project was subject to the Act. The Court held that the project was reconstruction, rather than maintenance, and, thus, subject to the Act, which is not relevant here. *Id.* at 185. The Court also considered whether the project was paid for "in whole or in part out of public funds" when the Borough paid for the project and then assessed the cost of sidewalk repairs to the affected property owners, who then were required to reimburse the Borough for their share of the sidewalk repairs. The Court reviewed *Penn National I*, and concluded that it governed. "The fact that [the Borough] was later reimbursed from private citizens does not, however, except this contract from being 'paid for in whole or in part out of the funds of a public body' because the fact that its funds were replenished is immaterial." *Id.* The Court also declined to separate the project into sidewalk repair, as private work, and curb repair, which was admittedly public work. The Court held that the entire project was public work subject to the Act. *Id.* at 186.

In *500 James Hance Court v. Pennsylvania Prevailing Wage Appeals Board*, 33 A.3d 555 (Pa. 2011), the Supreme Court considered whether construction of a building shell, which was to be fitted out with public funds for lease to a non-profit charter school, was public work requiring application of the Act. Charter

8

schools and their contractors are subject to the Act pursuant to the Charter School Law.[6] *Id.* at 557. In that project, the charter school's non-profit foundation provided financing through bonds issued by a public authority, and the foundation agreed to pay the developer a security deposit of $1.6 million (the amount of the bonds) through a long-term pre-development lease. *Id.* at 558. The Court analyzed whether the lease implicated regulation under the Act, and determined that it did not, which is not directly relevant here. The Court explained: "Nevertheless, we agree with the Bureau that the labels appended to transactional documents do not exclusively determine the applicability of regulation under the [] Act, as the potential for evasion and artifice is too great. Rather, as in other settings, the economic reality of the transaction should control." *Id.* at 573.

The Court considered *In re Phoenix Field Office, Bureau of Land Management* (ARB Case No. 01-010, filed June 29, 2001), slip op. at 8-11, and *Frank Lyon Company v. United States*, 435 U.S. 561, 573 (1978), to analyze the economic reality associated with the transaction in *500 James Hance Court. 500 James Hance Court*, 33 A.3d at 572-73. The Court agreed with the United States Supreme Court that "risk allocation should be a prominent consideration in assessing the economic reality of a business transaction and, in particular, a lease, and that such analysis appropriately extends to the [] Act setting." *Id.* at 573.

In *Penn National I*, the Supreme Court considered whether construction of a new headquarters building for Penn National, a private insurance company, was public work under the Act. When Penn National determined its present building in the City of Harrisburg (City) was inadequate, it considered moving to the suburbs.

---

[6] The Charter School Law is part of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, added by the Act of June 19, 1997, P.L. 225, 24 P.S. §§1-101 – 27-2702. The Charter School Law may be found at 24 P.S. §§17-1701-A – 17-1752-A.

To encourage Penn National to stay in Harrisburg, the City and an authority entered into a development agreement with Penn National to build the project in Harrisburg. *Penn National I*, 715 A.2d at 1069. The City acquired the property, paid for in part by a grant. The City was responsible for site preparation including asbestos removal, and the City entered into a contract for demolition and a $109,000 contract for asbestos removal. Under the development agreement, Penn National would ultimately reimburse the City for asbestos removal. *Id.* at 1070. When site preparation was complete the City would convey the property to Penn National, and Penn National would be responsible for the project's construction. *Id.* Also important, Penn National's construction project, totaling $30 million, would be financed in whole or in part through arrangements made with various public entities, including the City, the Harrisburg Redevelopment Authority, the school district, the county, and state funding including Tax Increment Funding (TIF) through the state Department of Commerce.[7] *Id.* The Commonwealth Court affirmed the Board and held that the project was public work subject to the Act, and Penn National appealed. *Id.*

First, the Supreme Court considered whether the unions involved had standing as intervenors, and determined they did. *Penn National I*, 715 A.2d at 1071-73. Next, the Supreme Court considered whether the Act applied to the entire project based on the public funding for asbestos removal. The Supreme Court summarized the four-part test under Section 2(5) of the Act defining public work as

---

[7] Tax Increment Financing Act, Act of July 11, 1990, P.L. 465, *as amended*, 53 P.S. §§6930.1-6930.13 (TIF Act). Generally, to encourage development in designated, distressed areas, the TIF Act permits public entities to enter into agreements with developers, in which, for a certain term, the taxing bodies agree to ultimately refund to the owner the TIF portion of real estate taxes collected. The specific mechanism for collecting and disbursing taxes in the Penn National project was discussed in detail in *Penn National II*.

10

"(1) there must be certain work; (2) such work must be under contract; (3) such work must be paid for in whole or in part with public funds; and (4) the estimated total cost of the project must exceed $25,000." *Id.* at 1074. All four elements must be satisfied for the project to constitute public work under the Act. *Id.* Describing the fact pattern as "unique," the Supreme Court determined that the City's role in the project was limited to site preparation and delivering vacant land to Penn National, and agreed that the asbestos removal part of the project was public work under the Act. *Id.* at 1073-74. However, the Supreme Court determined that "[o]ther than possible state financing addressed in issue three below, no post-conveyance construction contracts will be paid for in whole or in part with public funds." *Id.* at 1073. Because the record was lacking evidence regarding state financing of the project, including TIF, the Supreme Court reversed the part of our Court's decision that deemed the entire project as public work subject to the Act, and remanded to the Board for a hearing to determine whether these state "statutory financing arrangements" triggered coverage under the Act. *Id.* at 1075.

In *Penn National II*, the Supreme Court considered the same project from *Penn National I*, after remand, to determine whether TIF financing made the project a public work subject to the Act. The Board determined that TIF financing did not implicate public funds, the Commonwealth Court reversed, and Penn National appealed. *Penn National II*, 808 A.2d at 885-88. The Supreme Court held that monies paid to taxing authorities as tax increments, which, in turn, were used to pay off TIF bonds used to pay for construction, were public funds for purposes of the Act. *Id.* at 888. The Supreme Court described the project, summarized *Penn National I*, and then turned to the TIF issue, described as follows. In conjunction with the use of TIF Act financing, the taxing bodies approved the creation of a TIF

11

district. As part of the project plan, the authority issued TIF bonds of not less than $10.5 million. Penn National purchased the bonds, which, under the TIF Act, matured over a period not to exceed 20 years. The proceeds of the bond sales were held in trust under an indenture and disbursed by PNC Bank as trustee to pay a portion of the construction costs of the project. Pursuant to the TIF Act, the bonds were payable from positive tax increments that had been deposited in an established tax increment fund. The tax increment fund is a fund into which are paid all tax increments and revenues from the sale of TIF bonds, and from which money is disbursed to pay project costs for the TIF district or to satisfy claims of TIF bondholders. *Id.* at 886-87.

In that case, Penn National as the building owner was responsible for paying all real estate taxes to the taxing bodies, which included both the base real estate tax and the tax increment on the project. *Penn National II*, 808 A.2d at 886. In turn, the taxing bodies "were required to pay over to the issuing authority . . . that portion of the collected monies that represent the tax increment." *Id.* Those monies were then used to pay off the TIF bonds, the proceeds of which were used to pay construction costs for the project. *Id.* at 886-87. Our Court considered the TIF funding mechanism under the TIF Act and addressed the question of whether tax monies were merely foregone, or whether these monies were actually collected by the taxing bodies and redistributed. The Supreme Court quoted our Court's decision as follows:

> [T]he taxing bodies actually collect the tax increments from [Penn National] and, later, pay the tax increment to PNC Bank, trustee of the tax increment fund. Thus, for a period of time, the money exists in public treasuries. Then, literally, the money is paid "out of the funds of a public body" into the tax increment fund.

12

*Id.* at 887.

The Supreme Court rejected Penn National's argument that because the taxing bodies never had access to TIF payments, and the taxing bodies were not obligated to repay TIF bonds, TIF payments are not public funds. The Supreme Court agreed with our Court that the statutory scheme in the TIF Act and the evidence in the record supported the conclusion that the TIF payments were public funds. *Penn National II*, 808 A.2d at 888. The Court quoted testimony from the record that described TIF funding, and explained how TIF funding is different from tax abatement agreements, in which taxing bodies and an owner agree that the taxing bodies will forego a certain amount of taxes over a period of years, to encourage project development. *Id.* at 889. The Supreme Court determined that "[b]ased on the statutory scheme and the foregoing testimony, in our view, the monies paid to the taxing authorities as tax increments, which, in turn are used to pay off the bonds that are used to pay the cost of construction are public funds for purposes of the [Act.]" *Id.* The Supreme Court agreed with our Court that "for a time these monies do rest in the public coffers." *Id.* The Supreme Court contrasted TIF financing with tax abatements, stating "[t]o the contrary, the tax money is actually collected by the taxing bodies, and, in turn, these dollars are used to pay off the tax increment bonds that are used to pay the cost of construction on the project." *Id.* The Supreme Court further addressed whether the work was under contract, as required by the Act, concluding that the plain language of the Act does not require the work to be done under contract "with a public body" to be covered, which is not relevant here.

Although it does not interpret Section 2(5) of the Act, *Willman v. Children's Hospital of Pittsburgh*, 479 A.2d 452 (Pa. 1984), is also relevant to our analysis here. In *Willman*, the Supreme Court considered whether a construction

project for Children's Hospital, a private entity, was subject to the competitive bidding requirements of former Section 10 of the MAA, *formerly* 53 P.S. §312(A), as construction work "made by" any authority, when the project was financed by bonds issued by the Allegheny County Hospital Development Authority. *Willman*, 479 A.2d at 453-55. In that case, the authority entered into a trust agreement with Mellon Bank to serve as trustee for the bond proceeds, and the authority did not disburse or hold any funds for the project. *Id.* at 453. The Court held that the Children's Hospital project was

> a private project, backed by private property and private funds, and is to be managed and constructed by private parties. The [a]uthority's role is limited to providing a financing vehicle to assist the private parties in the construction project of a new hospital facility. Under such circumstances, the public competitive bidding requirement of the Section 10 [of the MAA] does not apply.

*Id.* at 456.

As to the first issue in this case, Ursinus provides a general argument that the Board erred in concluding that the Project was subject to the Act, because Project funding did not include "funds of a public body" merely through the Authority's issuance of the bonds. Ursinus argues that the Project is being paid wholly by private capital from private sources. IBEW responds that the Project is a public work because the Authority issued the bonds to fund the Project. IBEW also notes that Ursinus' spending of tax-exempt bonds issued by the Authority is limited to public, not private religious, purposes.

As to the second issue, Ursinus provides a more detailed argument focusing on the plain language of the Act, relevant case law, and the specifics of the Ursinus transaction. Ursinus reiterates that the bonds issued by the Authority were

14

purchased with Ursinus' private funds. Ursinus emphasizes that the Authority never had any access to these funds because the Authority assigned all its rights and responsibilities to the Trustee before Ursinus released its funds, as demonstrated by the bond documents. Ursinus argues that this type of transaction is a common method of financing private construction projects and has never been subject to the Act. Ursinus argues that the Board erred when it applied *Penn National II* to this transaction, because, unlike the taxing bodies in *Penn National II*, which held TIF funds in public coffers for a time before returning them to the developer, the Authority never held funds in its coffers at all. Ursinus acknowledges that the Authority is a public body, but argues that the funds used to pay for the Project did not come "out of the funds" of the Authority as required by the Act, because the funds were never in the Authority's coffers in the first place. Ursinus argues that it was the Trustee which paid for Ursinus' construction costs, not the Authority. Ursinus, like *amici* Development Authorities, points to decisions from other state courts on this issue as persuasive. Ursinus further argues that because the Authority had no obligations and assumed no risk on the bonds, and Ursinus is obligated to repay the bonds, the funds for this Project should be considered private, not public, under the Act.

IBEW responds that because bonds issued by the Authority are funds of a public body, the Ursinus Project is subject to the Act. IBEW focuses on the Loan Agreement between the Authority and Ursinus as evidence that the funds came from the Authority. IBEW argues that *Penn National II* governs here, because the Project funds rested, at least for a time, in the Authority's coffers.

*Amicus* Builders join in Ursinus' arguments, and add that subjecting private construction projects to the Act, when the Authority's role was limited to

issuing bonds, would harm the construction industry through higher wage costs, and subject builders to great uncertainty. *Amici* Development Authorities join in Ursinus' arguments and argue that the Board's "but for" test is contrary to the plain language of the Act, which requires the Project to be paid for "out of the funds of a public body." *Amici* Development Authorities further argue that *Penn National II* is distinguishable from the facts here, where no TIF funds were at issue. *Amici* Development Authorities also argue that the Board misconstrued *Borough of Ebensburg* and *Lycoming County*. *Amici* Chamber also join in Ursinus' arguments and argue that the Board's holding unreasonably expands the Act's definition of public work to cover transactions facilitated by an authority, when no taxpayer funds are involved. *Amici* Chamber argue that the Board's interpretation of the Act will discourage private construction projects for the public good. *Amici* Private Universities also join in Ursinus' arguments and argue that applying the Act to the Ursinus Project and its funding mechanism, which is a method commonly used by private universities, will harm identified and ongoing private building projects by inflating costs under the Act.[8]

---

[8] As to the third issue, Ursinus argues that the remedy of retroactive wages does not meet the test enunciated in *Blackwell v. State Ethics Commission*, 589 A.2d 1094 (Pa. 1991), and if the Project is determined to be public work under the Act, only prospective relief should be awarded. Ursinus argues that retroactive application of wage increases on the Project, which has already been completed for three years, would be unfair to Ursinus, especially where Ursinus relied on the Bureau's determination that the Project was not covered by the Act. *Amici* concur in Ursinus' arguments on retroactivity. IBEW responds that Ursinus was well aware that the Project was funded by public, tax-exempt bonds, and cannot now claim to be harmed. The Bureau argues that the Board has authority to order retroactive wages, and that the Act's remedial purpose favors retroactive wages. Because we hold that the Project is not subject to the Act, we need not reach this issue. "In general, the courts of this Commonwealth may not exercise jurisdiction to decide issues that do not determine the resolution of an actual case or controversy." *Borough of Marcus Hook v. Pennsylvania Municipal Retirement Board*, 720 A.2d 803, 804 (Pa. Cmwlth. 1998).

16

After careful consideration, we conclude that the Board committed an error of law when it determined that the Project was public work under the Act. At issue here is the plain language in Section 2(5) of the Act, which defines public work as construction work "paid for in whole or in part out of the funds of a public body."[9] Although the four-part test enunciated in *Penn National I*, 715 A.2d at 1074, uses slightly different language in the phrase "paid for in whole or in part with public funds," this difference does not affect our analysis of the plain language in Section 2(5) of the Act.

As found by the Board, the Authority issued the bonds, and under the Loan Agreement, loaned the funds to Ursinus for the Project. If the transaction stopped there, we might be persuaded to adopt IBEW's argument that the Project was paid for "out of" public funds. However, the transaction did not end there, nor is the transaction fully described solely in the Loan Agreement. We must review all the bond documents and other evidence in the record to determine the economic reality of the funding for this transaction. "Nevertheless, we agree . . . that the labels

---

[9] The applicable principles of statutory interpretation are as follows:

> We are mindful, as always, that the object of statutory interpretation is to ascertain the intent of the General Assembly, the best indicator of which is the plain language of the statute itself. 1 Pa. C.S. §1921(a)(b); *Department of Labor & Industry v. [Workers' Compensation Appeal Board] (Lin & [Eastern] Taste)*, 187 A.3d 914, 922 (Pa. 2018). Where statutory language is clear and unambiguous, this Court must give effect to the words of the statute. *Crown Castle NG [East] LLC v. Pennsylvania Public Utility Commission*, 234 A.3d 665, 674 (Pa. 2020). When interpreting a statute, courts may not look beyond the plain meaning of a statute under the guise of pursing its spirit. *Id.*; *see also Warrantech Consumer Products Services, Inc. v. Reliance Insurance Company in Liquidation*, 96 A.3d 346, 354 (Pa. 2014).

*City of Johnstown v. Workers' Compensation Appeal Board (Sevanick)*, 255 A.3d 214, 221 (Pa. 2021).

17

appended to transactional documents do not exclusively determine the applicability of regulation under the [] Act, as the potential for evasion and artifice is too great. Rather, as in other settings, the economic reality of the transaction should control." *500 James Hance Court*, 33 A.3d at 573. The Supreme Court also noted that "risk allocation should be a prominent consideration in assessing the economic reality of a business transaction." *Id.*

As the Trust Indenture, Bond Purchase Agreement, and Closing Statement reveal, the Authority was obligated to transfer the funds to the Trustee, this transfer took place before Ursinus received any funds for the Project, and the Authority did not hold these funds. The funds Ursinus used to pay for the Project were disbursed by the Trustee and not by the Authority. When we review the economic reality of this transaction, which is documented in the entirety of the bond transaction documents contained in the record, we conclude that the Project was not paid for "out of the funds" of the Authority as a public body, which is what the plain language of Section 2(5) of the Act requires. We reject the Board's reasoning that the Project is covered by the Act because "Ursinus would not have had this funding stream available but for the existence of the Authority and its coordination of the funding through its statutory powers as a public body." R.R. at 199a. Section 2(5) of the Act does not include a "but for" test, and requires that the work be paid for "out of the funds" of a public body. Where, as here, the language of the statute is clear and unambiguous, we must give effect to the words of the statute. *City of Johnstown*, 255 A.3d at 221. Further, because Ursinus, and not the Authority, bore the risk for repaying the bonds, the economic reality of this transaction reveals that the Project is not public work subject to the Act.

18

The Board also erred in concluding that *Penn National II* governed this Project. The Penn National project was partially funded by City funds for asbestos removal, as determined in *Penn National I*, and partially funded by public tax dollars through TIF funding. *Penn National II*, 808 A.2d at 889. By carefully reviewing how the TIF funding operated, our Court and the Supreme Court concluded that the Penn National project was paid for out of public funds, because the taxing bodies collected real estate taxes including the TIF increment, held those funds in their coffers for some period of time, and then refunded the TIF increment to Penn National to pay for its project. *Id.* at 889. By contrast here, no public funds from the Authority, or from any taxing body, either directly or through TIF increments, were used to perform any Project work. Therefore, we conclude that *Penn National II* is distinguishable from this case based on the facts of the transaction, and its holding does not require the Project to be considered public work under the Act.

Similarly, the holdings of other cases relevant to the interpretation of Section 2(5) of the Act do not require the Project to be public work under the Act. *Lycoming County* is not applicable here because, unlike the County in that case, the Authority here did not contract for or direct any work on the Project. Unlike the County in *Lycoming County*, the Authority here did not acquire or lease land for the Project, nor did the Authority remain liable for bond repayment. Ursinus, a private entity, used its private funds to purchase the bonds, and Ursinus, not the Authority, was obligated to repay the bonds. *See Lycoming County*, 627 A.2d at 240-41. Further, unlike the relationship between the County and the non-profit entity it created in *Lycoming County*, the Authority did not serve as Ursinus' alter ego for the Project, but rather as the vehicle for Ursinus to fund the Project, through the issuance

19

of bonds as authorized by the MAA. Therefore, we conclude that *Lycoming County* does not require the Project to be defined as public work under the Act.

*Borough of Ebensburg* is not applicable to this transaction either. In *Borough of Ebensburg*, the Court considered whether the Borough's project was public work paid for in whole or in part out of public funds, when the Borough paid for the project and then assessed the cost of sidewalk repairs to the affected property owners, who then were required to reimburse the Borough for their share of the sidewalk repairs. *Borough of Ebensburg*, 893 A.2d at 185. The Court concluded that the fact that the Borough, the public body, was "later reimbursed from private citizens does not, however, except this contract from being 'paid for in whole or in part out of the funds of a public body' because the fact that its funds were replenished is immaterial." *Id.* Here, Ursinus' private funds were used to fund the Project, and not the funds of the Authority. Ursinus did not reimburse the Authority, nor did the Authority take any risk in this transaction, because Ursinus, not the Authority, was obligated to repay the bonds. There is no evidence that this transaction was structured to evade designation as public work, when the Authority's role was limited to providing bond funds, as authorized under the MAA, for Ursinus' Project.

The transaction here is similar to the transaction reviewed in *Willman*, where the Supreme Court held that the Children's Hospital's construction project was not subject to competitive bidding under the MAA, as "construction work made by any authority," when the project was privately funded on private property and managed by private parties. *Willman*, 479 A.2d at 456. Like the Authority's role here, the authority's role in *Willman* was limited to providing a financing vehicle by issuing bonds to assist in the construction of a private project, in which the authority

20

did not disburse or hold project funds, assigned all funds to the trustee, and bore no risks or obligations for the bonds. *Id.*

Accordingly, the Board's order is reversed.

_____
MICHAEL H. WOJCIK, Judge

Judge Ceisler did not participate in the decision of this case.
Judge Dumas did not participate in the decision of this case.
Judge Wallace did not participate in the decision of this case.

21

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ursinus College,                          :
                                          :
                    Petitioner            :
                                          :
          v.                              : No. 828 C.D. 2021
                                          :
Prevailing Wage Appeals Board,            :
                                          :
                    Respondent :

# **O R D E R**

AND NOW, this 4th day of August, 2022, the final decision and order of the Pennsylvania Prevailing Wage Appeals Board, dated June 25, 2021, is REVERSED.

_____
MICHAEL H. WOJCIK, Judge